Case number 25-1963, Zamaria Metcalf v. State of Michigan, et al. Argument is not to exceed 15 minutes per side. Mr. Nyholt for the appellant. Good afternoon, your honors. Good afternoon. I'm attorney Colin Nyholt. I represent the appellant, Zamaria Metcalf. I have requested five minutes for rebuttal. Zamaria Metcalf applied to become a foster parent in the state of Michigan. The Enos Center did her home study. The first, last, and only question Enos asked when it was doing her home study was whether she had a disability. She is a quadriplegic. After a car accident she had when she was 17. But without even considering her income, her resources, her attitudes to parenting, her reasons for fostering, her neighborhood, or her own ability to provide a safe environment for children through the use of her aids that she has to perform the physical tasks, and without any consideration of her emotional ability to provide emotional support for the children, they denied her. Not only that, Enos recommended and the state accepted a recommendation that she should be found in willful violation of the state licensing rules because she even dared to apply. Their allegation was that because she knew that she was a quadriplegic and she had applied to become a foster parent, she was in willful violation of their obligations, that she should understand her obligations and the needs of foster children. Did the state deny her application? No. They closed it administratively after threatening her with a five-year suspension if she should appeal the administrative closure further. The fact that it's an administrative closure, does that open a door for her to provide further evidence or to have further discussions about her applications? I mean, I know if you get a formal denial, there are implications with that. You told me, okay, she wasn't formally denied. Is there any opportunity or window there? Not really, because she'll be every bit as much a quadriplegic if she reapplies or submits more evidence than she was before. This was the only thing that they considered. I mean, going through the steps here, she had the physician certification, this Dr. Friedman, who, because he personally believes, and he testified to this in his deposition, that it's irresponsible for a person with her level of disability to seek to become a parent, found with no discussion of anything beyond her disability that he would not certify her. And what really killed me about Friedman, it wasn't... I'm struggling. Wasn't that his medical opinion? The trouble with that is his circumstance really aligns itself with the circumstance in Keith versus Oakland County. And what was happening in that one is you had another situation. That was an individual who was deaf, had sought to become a lifeguard. And the doctor walked in and said, took one look at him and said, there's no way a deaf guy can be a lifeguard and refuse to sign the certification. And what this court said in those circumstances is that because he hadn't actually looked at the factors, looked at whether it could be satisfied through underlying aids, what he said was, and I'm going to give you the exact quote because it's important. While you're looking, you're talking about the doctor's statement? Yes. He's not a defendant, though, is he? No, but what the court found is that because he hadn't done this... There's no allegation that he acted with animus or discriminatory intent, is there? The allegation is that because he didn't consider the underlying factors. Let me give you the... But the doctor was her own doctor. She asked this physician to fill out the form, correct? Well, correct, but what this court held... It's like your own expert. It was a situation just like in Keith. And what this court said is because it strikes us as incongruent with the underlying objective of the ADA for an employer to make an individualized inquiry, only to defer to the opinions and advice of those who have not, the doctor who had not, we direct the district court to consider these questions on remand. She went to another doctor to see if she could get a better outcome? I mean, she had the control as to who the doctor was, didn't she? Right? I'm just trying to understand. It seems like normally I'm treating him like her own expert witness, and he testified against her, essentially. So that's bad for her, but how can you say that's the government's fault? That was her fault, wasn't it? Because they relied on it because he didn't do the individualized inquiry. The law requires an individualized inquiry. I thought in your brief that your argument was that the form, essentially, that they asked the doctors to do doesn't ask about accommodations. Correct. So maybe the doctor didn't necessarily do anything wrong in answering the questions that he was asked to fill out. It's a physical form or some check boxes. Yes, with a series of yeses and noes. Right, I remember seeing it. But that it wasn't focused on the doctor, but on whether the doctor was asked about reasonable accommodations and whether reasonable accommodations were considered. That's why I'm slightly confused. The state itself should have asked the doctor more questions? The state should allow within its scheme for the individualized consideration, because Dr. Friedman testified that if he had considered whether the aides could provide the physical stuff that needed for the children, he may have answered differently. In other words, he checked, no, she can't do it. He said, well, yeah, if I'd considered the aides, I would have checked yes. But isn't the problem with the aides her testimony that she had not even spoken to her aides or made any arrangement with them about assisting in the care of foster children? That misstates the testimony, because she has had foster children. She's had children that have lived with her outside of the foster system, and she's used the aides to provide the physical tasks that are necessary for them. Both Michael Metcalf, her nephew, and Zaria Metcalf, her niece, testified that they lived with her for extended periods of time and received appropriate care. But the doctor's testimony is that the aides are provided by insurance only for care of the individual. You got that from the state, but that's a misstatement of how the arrangement with the aides worked. Ms. Metcalf has the ability to hire people to do physical tasks for her. She has income from her annuity. That's very substantial. The problem is that she testified that she had not spoken to any aide about their willingness to undertake that responsibility, even if she paid them, because the evidence was she did not have a contract with them. They came at no particular wage. They came when she needed her, in and out. Weren't there 23 people on that list of people who assisted her? And yet she had not asked any of the ones that she employed if they were willing to undertake this, right? The reality of the situation is she had always traditionally, when she'd have children stay with her, the aides would do the cooking and the cleaning. And number two, the physical tasks that they're providing for her benefit children. If they make dinner, the kids will eat some of it. So sometimes kids have to go to the pediatrician.  Tell me about it. I know it's mine.  So presumably these aides would drive the kids to the pediatrician? Yes. So I think to build a little bit on Judge Stranch's questions, can you point to us places in the record where she provided confirmation to the agency that the aides who would be there would do these things in the future, right? There's some sense that, okay, they did them in the past when kids were staying with her before, but obviously there are different people, there are different aides coming in and out, that if somebody needs to go to a sick day visit the next morning at the pediatrician, that definitely somebody would do this. Right. And the reason that's not in the record is they never did the individualized consideration and they asked her these questions. When you look at the home study, it says over 70 times, this area not considered because the recommendation is denial, and the only reason they relied upon that in the home study was that she has quadriplegia. But wasn't there testimony that she was asked about aides, that she asked, you know, do the aides have to get CPR certification and things like that? There was certainly testimony about it. And if she's seeking an accommodation, is it on the burden on her, at least to some extent, to say, this is how I can do this, and look, I talked to my aides, and here's who's going to drive to the pediatrician? Yeah, and that was what she testified that she said to them. I think the – what she testified was, I did ask the Enos Center would my staff need to be foster care, would they have to take the foster care classes, or would they just be able to do first aid and CPR? That was her deposition, ECF number 60-9, page ID 1441 to 1442. This was discussed with them. They just didn't follow up because they denied her for the sole and only consideration that she's a person with quadriplegia. That's the problem, the big problem with all of this, Your Honor, is they are required to do an individualized evaluation, and they didn't do it. I see that my time is up. Unless there are any other questions, I'll... Okay, you have your rebuttal. Thank you. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court, Assistant Attorney General Marissa Wiesen, on behalf of the State Defendant. Your Honors, I'd like to begin with an issue that I really think goes to the heart of appellant's theory in this case and perhaps wasn't fully developed in our briefing. And this is the theory from Ms. Metcalf that because the medical certification form filled out by Dr. Friedman, because it doesn't include a space for a narrative or a checkbox selection on whether adaptive aids will or could be used, that this, in and of itself, is discriminatory. And that the State somehow, because the form doesn't ask those questions, that the State's inquiry somehow stopped there. And this is simply not the case. On the undisputed facts on the record. First of all, nothing in the ADA or Section 504 dictate how a medical certification form has to be filled out. That's not part of the law. It's not part of the individualized inquiry law. And it also... Could there be an individualized inquiry about an individual who's a quadriplegic who is applying for foster care that the State would grant? Sorry, just to clarify the question. Let me make it simpler. I didn't ask that in a very nice way. Is there a categorical bar that the State has or that the agency has on quadriplegics being foster parents? No, there's certainly not a categorical bar, whether it's in the form or the supplemental analysis that the State did in this case. So what kind of accommodations are showing would the State need in order to grant the application? So hypothetically speaking, because in this case we didn't have that type of accommodation. But hypothetically speaking, an accommodation would need to be such that it didn't waive the essential licensure requirements similar to what Ms. Metcalf was proposing. So in this case, we had a proposed accommodation that an aide who would not be a licensed foster parent would be doing all of the physical care for any foster children residing in the home. Hypothetically speaking, again, not the facts that issue here, if there was a co-applicant who was doing the physical care and that individual was also licensed, whether it was an aide, if it was a relative of Ms. Metcalf, I think that that would be a consideration because there would be additional licensee that the State and the Department of Child Welfare Licensing could hold accountable. I was actually really confused by the record about when the State requires kind of a co-licensee or like a co-applicant or co-parent. However, a second full foster parent here, like if somebody who's really busy at work, maybe they're a business consultant flying all over the place all the time, has a live-in au pair, does that person have to be a co-licensee? So it's hard to say because it really is a case-by-case basis. Okay, so take the case I just gave you. Sure. Does the au pair who's probably, quite frankly, going to be there more waking hours than the technical foster parent, does that person need to be a co-licensee? I would say if the Rule 9201D states that anyone who is performing the role of the licensee does need to also be licensed. But like perform the role of the licensee, like for what period of time? I mean, I'm here this week and my parents have my children, right? Like they're performing my role right now, right? If they were to be foster kids, do they have to be licensed just because I'm gone a few days? So there is, and I wouldn't say an exception, but the rules and the statute don't require licensure for like occasional situations of babysitting. Like you're not obviously required to, if you go out to dinner, have a licensed foster care parent step in your shoes. But the issue in this case is that there's no situation where Ms. Metcalf would be able to perform the physical duty. So the other individual would be solely responsible, or individuals would be solely responsible for any physical care, any transportation of the foster care children. That sounds like it is turning on her disability, this whole requirement of an additional license. Because suppose you had a totally, you know, absentee person, you know, who had all the money in the world to get all the care they want for the foster child. In that situation, are you saying you would require licensing for the caregiver that was being hired? So I would say, in theory, if it was a situation perhaps where the foster care applicant traveled Monday through Friday and they had an au pair or they had a full-time nanny or perhaps a spouse or something like that, that was from Monday to Friday, 24-7, doing the full-time care for those foster children. I can't speak definitively, but based on my understanding of the rules and the law, that could be a situation where there would need to be an additional applicant because that nanny, that au pair, that other individual in the house would be doing the vast majority of the care if you just look at the time, you know, given in a week. And there is a separate rule for individuals living in the household, right? So say you have an older son who's 17 years old and you want to be a foster parent. That 17-year-old, depending on the role that he or she may take, wouldn't necessarily be required to be a licensed foster parent. In fact, I don't believe he could because he wouldn't be 18, so perhaps the age isn't quite the right analogy, maybe a 20-year-old college-age son. But they have to do a background check, and, you know, there's requirements, but they're less stringent because they would just be residing in the home along with the foster children. They wouldn't be, you know, responsible. What about if you didn't have just one person you were hiring out, but you're hiring out, you know, a gardener, the cook, the housekeeper, the, you know, everything?  You're a chauffeur. Are you going to have to license all those people if you're parceling it all out to different people? So it's hard to say because, again, it's really a case-by-case assessment on what the licensee or the applicant is doing and what these other individuals are doing. I think, you know, a gardener, for example, wouldn't necessarily be responsible for taking care of the home, but they wouldn't be responsible for taking care of the kids. A cook or a chef would prepare meals for the licensee and the children, but they wouldn't be responsible for that hands-on, day-to-day mental... What if, taking a hypothetical that's a little bit closer to the facts of the case here, what if the applicant had presented a plan by which they said, well, I have this person who is hired the first third of the day to be all of the things that I would physically do, right? My arms, my, you know, all that stuff, right? I have this person who is hired for the second third of the day, and I have yet another person who is hired for the third of the day. So you have 24-7 coverage. Judge Bush's questions, this is divided up between multiple people who are going to do the physical on her direction, right? Because the kind of mental, emotional is still coming from the applicant. And, you know, quite frankly, these are staff, these are paid people, but maybe she says, you know, if I'm ever going to lose one of these people, here's how I'll replace it. Here are my finances such that I can pay for these people, you know, or something like that. Would those people have to be separately licensed? I think that if anyone who is doing a significant amount of the physical care for the child, they would need to be licensed. as a other individual living in the house. The second step would be whether or not they need to be a licensee. And, you know, I can't speak to all of the other factors that go into this, right? But I believe that they would need to be licensed because they are doing the physical care for that child. And while it's at the direction of someone else, the issue for DCWL and the state defendants is that, take, for example, one of those three individuals responsible for caring for the children during the day. If they're not licensed and they are not appropriately caring for a child, let's say they don't change the baby's diaper for eight hours or they don't take the baby to, or any child, to the doctor when they need to go. They don't, you know, Ms. Metcalfe perhaps could direct them to say they need to drink this amount of water a day, but she can't enforce that. And what that leaves the state and the Department of Child Welfare licensing with is no accountability, no way to hold those individuals accountable because they aren't licensed. Well, isn't that still her responsibility as the parent to fire that person and get another person the same way as, you know, if you're au pair or you're Friday babysitter, or, you know, you learn that the person driving your kid to baseball practice isn't making your kid wear a seatbelt, right? Like, you know, it's the parent would take accountability. I mean, she still can fire the person. She has a plan to hire another person. Like, you still have accountability through the parent, through the applicant. She has that accountability, but she still doesn't have the ability to enforce any physical accountability. And, again, these were – I do want to hit on the point that – I mean, that's starting to sound like a categorical rule, like somebody who can't enforce physical accountability can't be a sole applicant. Well, I think that the accommodation is that the individual who is giving the physical care would just need to be licensed so that the other – so that the state and so that the Division of Child Care and Welfare Licensing can enforce accountability against them. But if you become licensed, does that mean you're taking on the role as the foster parent for that child indefinitely? Yes. So a licensee is the – once you have the license, you can be a foster parent, yes. So that's – Or within this example, they would just be allowed to maintain and care for the children in that circumstance. It's not – it's because they're employed to do it as opposed to the person who made the actual application. So anyone doing the physical care for the children would – for a vast majority of the time, not an hour here or there – would need to be licensed as another individual. I think that Nick's example – or, sorry, the opposing counsel's example was something about how they would be another individual living in the home that would be subject to a background check. This is – there's varying degrees of certification, right? So there's another individual, and then there's a licensee. I'm confused a little bit about the responsibilities of the licensee. Like, could somebody get certified or become a licensee and then not have full parental responsibility for the child? Like, if I'm only responsible for this child from the hours of, like, 9 in the morning to 2 o'clock, right? You were saying in my hypo when I divided up the day that these people would be licensees. Like, if something is happening to the child on somebody else's shift, is this first licensee responsible for it? Are they akin to a foster parent to this person? I'm confused about the scheme and what's the difference between a licensee and an actual foster parent. A licensee is a foster parent. Okay, so essentially a scheme where she's hiring people who might not take on being this person's foster parent for the duration of the fostering would not work in your scheme. If they didn't want to become licensed. If they didn't want to become a foster parent. Correct. So she has to find somebody else who will be a foster parent with her. A co-applicant. And I think the dispositive factor here is that Ms. Metcalf testified she did not want a co-applicant. She wanted to do this herself. Her application was signed by herself in her deposition testimony. She was explicit. She wants to be able to do this on her own. Is the license point the only reason why she's been denied a license? Or are there other reasons why the state is not giving her a license? Once the state did receive the medical certification form and did its individualized inquiry, and it did, it looked at the proposed accommodation. You don't have much time left, so just give us what the other points were. What are the other reasons why the state is denying the license besides the fact that she doesn't have a license for these other people? It did not get to that inquiry. The NS Center didn't engage in those other factors, and that's typical of an application. Once they had determined that she could not safely care for foster children, it didn't continue down. So the only basis right now that the state is saying she does not have a license is because she did not get a license for these other people that she said could take care of the kids. That was not the accommodation that she proposed. And the accommodation that she did propose, whatever it was, wasn't going to be good enough because the only accommodation that the state will accept is a co-licensee. If I may just answer the question, I know my time is up. So the accommodation that Ms. Metcalf proposed was that there were no additional licensees and that she would hire her existing transient aides who she doesn't have contracts for, doesn't have schedules for. They come and go. They don't have a regular routine. They would also be caring for Ms. Metcalf, and they would be also caring for the foster children. Right, but there's daylight between her proposal wasn't good enough and everyone has to be a co-licensee. Okay, so I'm trying to figure out, is it your position that you have to have a co-licensee or is it only your position of what she proposed wasn't good enough but there might be something short of there being a co-licensee that could work? I think there could, in theory, be somewhere in the gray area, a reasonable middle ground. The issue in this case is that Ms. Metcalf had never engaged in the NS Center. She had never responded to any letters or additional requests for information from the state or from the NS Center on her application. Her application was closed, and she is more than able to reapply or reengage in conversations with the department or with the state, and she hasn't done so. We had to look at what the application was at the time that it was submitted with the information that we had, and at that time, it was not able to make a determination that she could safely care for her. One more. Sorry. No, you go ahead, and I'll ask mine after that. If she kind of started to reengage and maybe respond to some of those questions or correspondence that you say wasn't responded to and said, okay, let's have a back-and-forth about what might work and things like that, does she risk this punishment that your friend was talking about? No. So at this point, the application is closed, and there's no intention, as far as I'm aware as counsel, there's no punishment for reengaging in that. That's exactly why the application was closed and not denied. If it was denied, she would have a five-year ban on reapplying, but the decision was made intentionally by the department to close it so that she could reapply and there could be continued conversations. Ms. Metcalfe has been the one that hasn't reengaged in those. And my question is, I just want to close the loop. I'm hearing that you're not saying there's anything about her monetary ability to pay the aides that had any bearing upon this denial, or did it? I just need to know one way or the other. The reason that the aides were not a reasonable accommodation was that they are number one designed for Ms. Metcalfe's care. She needs 24-7 physical support. And so to add on an additional burden of additional tasks of foster children was simply just not something that any of the aides said they were willing to do or wanted to do. She talks a lot about her proposal that she'll use her own money to hire more aides, but the issue is that's not the proposed recommendation that she discussed with the NS Center, and that's not what we have in this case. We could certainly go back and look at that, but this appeal is limited to the record and the request that she made. It's not, in theory, all of the new allegations or ways that she thinks this could have made work. Okay. Thank you, Your Honors. Thank you. I would encourage the court to look closely at the application file, which is in evidence. The state has identified that as containing all of the reasons for their actions towards the administrative closure. It does not indicate any requests to her to discuss the aides. It does not indicate any opportunity for her to come back and appeal anything. The letter itself does. The letter itself says that it's administratively closing your license application, and then it says if you appeal the closure, these things could happen, but the administrative closure itself leaves the window open for the submittal of more information. Right, but the things that it said could happen if she did that, was a five-year exclusion not just from applying herself. No, no. The things it said would happen is that if it is administratively closed, she can bring more information in at any time. If instead she appeals this and receives an actual denial of her request, then the time bars come into effect. The conversations about the aides had not occurred at this point, though. They had not. The state says that they had requested that and that that was not provided. And that's incorrect, if you look at the remainder of the file. Well, you're not answering my question. My question is, this is an administrative closure, which leaves her the capacity now to go back and to provide further information. The only time that there is a question of a bar is if there is an appeal and the person appealing loses the appeal and there is a formal denial entered. At that point, there is a time period during which the person may not apply. And I'll stand to be corrected, but that's what the letter indicates and that's my understanding of the record. But at this point, she's still appealing against a law that says a person that has a condition that can affect the care of children. That's not an answer to my question. My question is, isn't she in the position to provide more information from the state now because she perhaps wisely chose not to appeal her and not to receive a formal denial? So the opportunity remains available. And my answer to that, Your Honor, is yes, she has the opportunity to present more information, but no, it will not make any difference because she will still be a quadriplegic subject to denial from the program and willful violations for applying for being a quadriplegic. The willful violations is the bar period. But that's only if she receives a formal denial. And she has not received a formal denial. I'm referring to the willful violation that Enos Center found her in when it did the home study, when it said that she didn't understand the care of children because she applied because she was quadriplegic. That's what the record shows. And the administrative closure, except that there are... Could you cite us to the page that the record shows? Because the application is superseded and resolved by the letter... Well, I'm referring... Which is the administrative closure so she can provide further information along the way. And I'm sure I discussed this in detail in my brief. I would refer to that if I'm able to find it as I'm standing here in the next 46 seconds. We'll look at your briefing. Okay. Thank you, Your Honor. Counsel, do you have any more points? I do not. Okay. Thank you for your argument. We will take the case under submission.